The INN AT SARATOGA ASSOCIATES, a New York limited partnership; Myra Rynderman, as Administratrix of the Estate of Monia S. Rynderman; William F. Chandler; Steven N. Fischer; Roy Fischer; John S. Gijanto; Lawrence A. Kotlow; and John E. Wolfgang, individually, Plaintiffs–Appellants,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, as receiver of the Bank of New England, N.A., Defendant–Appellee.

No. 935, Docket 94–6205.

United States Court of Appeals,
Second Circuit.

Argued Dec. 19, 1994.

Decided July 10, 1995.

Phillip G. Steck, Albany, NY (Cooper, Erving, Savage, Nolan & Heller, Albany, NY, of counsel), for plaintiffs-appellants.

Kathryn R. Norcross, F.D.I.C., Washington, DC (Ann S. Duross, Richard J. Osterman, Jr., F.D.I.C., Washington, DC, of counsel), for defendant-appellee.

Before: VAN GRAAFEILAND, WALKER and CABRANES, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

On August 1, 1986, the Inn at Saratoga Associates, a limited partnership, Monia Rynderman, its general partner, and seven of its limited partners sued Berkshire Bank & Trust Company in New York Supreme Court alleging that Berkshire reneged on a loan contract. Thereafter, Berkshire was acquired by the Bank of New England, N.A., which subsequently was declared insolvent. When the Federal Deposit Insurance Corporation ("FDIC") took over as receiver for the Bank of New England, the case was removed to federal court. There, the FDIC moved for summary judgment, arguing that plaintiffs' claims were barred under 12 U.S.C. § 1823(e) and the equitable estoppel doctrine articulated in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). The district court (Gagliardi, J.) granted the motion and judgment was entered in favor of the FDIC. Plaintiffs appeal from that judgment. We affirm.

The facts have been stipulated by the parties. On January 15, 1985, Rynderman met with William Porter, a vice president and regional loan officer of Berkshire, to discuss a possible $617,500 loan for the purchase and renovation of a hotel known as the Coachman Inn. Rynderman told Porter that he planned to form a limited partnership, of which he would be the general partner, for the purpose of this renovation project. On January 24, Berkshire sent Rynderman a loan commitment letter which provided that the commitment would expire if Rynderman did not sign and return the letter and pay an

origination fee within fourteen days. Rynderman neither returned the letter nor paid the fee.

Shortly thereafter, Rynderman informed the bank that he would like to increase his loan request so that rooms could be added to the hotel. On April 9, Berkshire issued a second commitment letter in the amount of $875,000, which again specified a limited period for acceptance. Once more, Rynderman failed to indicate his acceptance within the specified period.

On April 25, Rynderman and two of his associates, Steven Fischer and Richard Kotlow, met with Porter to discuss increasing the proposed loan to over $1 million. While this request was pending, Rynderman, acting on behalf of the partnership, entered into a contract to purchase the Coachman Inn.

On July 3, plaintiffs agreed to provide $200,000 in personal guarantees to induce Berkshire to approve a loan of $1.3 million. That same day, Berkshire's loan committee approved the $1.3 million loan subject to ten conditions, including participation by a second lender in the amount of $500,000. This action is memorialized in the committee minutes.

On July 15, Porter sent a letter to Kotlow. The letter states in pertinent part as follows:

> In order that we might conform to existing holding company policy, I must ask that you forward to me ... personal financial statements on the five limited partners who are willing to sign the $200,000 recourse guaranty.

> Our Loan Committee, subsequent to a formal review of the March 31, 1985 financial statements on the Lookout Inn [another entity owned by Rynderman], have ratified the $1.3 million loan. I assumed [sic] that the financial statements on the Lookout Inn will give us the comfort that we seek in those statements and I look forward to ironing out all the final details relative to this mortgage loan at the earliest possible convenience.

On August 21, plaintiffs forwarded proposed closing documents to Berkshire, referring to the total loan amount as $1.3 million. A few days later, Berkshire officers drafted a proposed commitment letter in the amount of $1.3 million. However, Berkshire did not approve the letter and it did not execute plaintiffs' closing documents.

On August 30, plaintiffs met with Berkshire officials for a loan closing, bringing the personal financial statements requested by Berkshire. The outcome of this meeting was that plaintiffs received a $375,000 loan from Berkshire. Although plaintiffs contend that this was the first installment of a $1.3 million loan, none of the signed documents in the transaction mentions the larger amount. Plaintiffs repaid this loan within four months.

On September 10, Berkshire lending officers, meeting with representatives of the partnership, informed them that they still lacked supporting documentation for their proposed $1.3 million loan. The bankers also questioned the appraisal of the hotel provided by plaintiffs. At this meeting, the need for a participating lender was discussed.

While Berkshire searched for a participating lender on the $1.3 million loan, construction on the hotel commenced. On October 3, 1985, an Inn representative telephoned Berkshire and asked for an advance to pay construction expenses. Because no participating lender had yet been found, Berkshire refused this request. A week later, Rynderman demanded the advance and confirmation of the $1.3 million commitment and threatened legal action if Berkshire did not comply. Berkshire declined to comply with this demand.

On August 1, 1986, plaintiffs commenced this litigation against Berkshire in state court, contending that an agreement had been reached as to the $1.3 million loan. After this suit was brought, the Bank of New England acquired Berkshire. On January 6, 1991, the Bank of New England was declared insolvent and the FDIC was appointed as its receiver. The FDIC removed plaintiffs' action to federal court and the grant of summary judgment followed. The district court's opinion is reported at 856 F.Supp. 111.

■ The principles which compel the rejection of the plaintiffs' claim were set forth first in *D'Oench, Duhme, supra.* In

*D'Oench, Duhme,* the FDIC sued to enforce a promissory note that it had acquired from a failed bank. The maker of the note raised as a defense an oral agreement he had with the bank that the note never would be called for payment. Relying on "a federal policy to protect [the FDIC], and the public funds which it administers, against misrepresentations as to the securities or other assets in the portfolios of the banks which [the FDIC] insures or to which it makes loans," 315 U.S. at 457, 62 S.Ct. at 679, the Supreme Court rejected this defense. It held that persons who lend themselves "to a scheme or arrangement whereby the banking authority on which [the FDIC] relied in insuring the bank was or was likely to be misled" may not raise the scheme or arrangement as a defense to an FDIC collection action. *Id.* at 460, 62 S.Ct. at 681.

Congress incorporated the doctrine thus articulated in section 13(e) of the Federal Deposit Insurance Act, Pub.L. No. 81–797, 64 Stat. 873, 889 (1950), codified as amended at 12 U.S.C. § 1823(e). The amendment broadened the statute to protect assets acquired by the FDIC when it acts as receiver for a failed bank. *See* Financial Institutions Reform, Recovery, and Enforcement Act, Pub.L. No. 101–73, 103 Stat. 183, 256 (1989). As amended, section 1823(e) provides as follows:

> No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it … either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
>
> (A) is in writing,
>
> (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

> (D) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C.A. § 1823(e)(1) (Supp.1995).

In the instant case, plaintiffs allege that Berkshire reneged on an agreement to provide a $1.3 million loan. To prove the existence of this agreement, plaintiffs proffered three writings: the minutes of meetings of Berkshire's board of directors, the unexecuted loan commitments drafted by Berkshire, and the Porter letter. The district court found that none of these documents met the criteria of section 1823(e). 856 F.Supp. at 116–17. Because plaintiffs could not produce indicia of an agreement that met the statutory requirements, the district court granted the FDIC's motion for summary judgment.

On appeal, plaintiffs argue that section 1823(e) should not have been applied to their claims. They contend that section 1823(e)(1) applies only to agreements relating to particular, identifiable assets acquired by the FDIC and that the instant dispute does not involve such an asset. Case law weighs in favor of plaintiffs' statutory construction. *See John v. Resolution Trust Corp.,* 39 F.3d 773, 776 (7th Cir.1994) ("Section 1823(e) requires an identifiable 'asset' which is acquired by the bank and then transferred to the regulatory agency, and to which the unenforceable agreements must relate."); *E.I. du Pont de Nemours and Co. v. FDIC,* 32 F.3d 592, 597 (D.C.Cir.1994) ("[M]ost courts have read the statute as applicable only to cases involving a specific asset, usually a loan, which in the ordinary course of business would be recorded and approved by the bank's loan committee or board of directors.").

 The district court held that the asset requirement was met because the relevant "asset" in this case was the "Bank's conditional promise of a future loan in the amount of $1.3 million." 856 F.Supp. at 115. Although we agree with the result reached below, we are not persuaded to adopt the district court's reasoning. As generally construed, the term "assets" means "everything which can be made available for the payment of debts." *Black's Law Dictionary* 151 (rev. 4th ed. 1968). Although the terms of section

1823(e) should be interpreted broadly, *see, e.g., Langley v. FDIC,* 484 U.S. 86, 91, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987), we believe that construing a promise to make a loan as an asset may bend the term "asset" beyond recognition. The Fifth Circuit cases relied on by the district court (*see* 856 F.Supp. at 114) involved applications of the common law *D'Oench, Duhme* doctrine, which, unlike its statutory counterpart, is not limited to circumstances where the agreement alleged relates to a traditional bank "asset" acquired by the FDIC. *See OPS Shopping Ctr., Inc. v. FDIC,* 992 F.2d 306, 309–10 (11th Cir.1993); *see also Hall v. FDIC,* 920 F.2d 334, 339 (6th Cir.1990), *cert. denied,* 501 U.S. 1231, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991); *North Ark. Medical Ctr. v. Barrett,* 962 F.2d 780, 788–89 (8th Cir.1992).

Those courts that adhere to the common law doctrine generally believe that application of the statutory "asset" requirement would undercut an important purpose of that doctrine—allowing the FDIC to rely on a bank's records when insuring the bank. *See D'Oench, Duhme, supra,* 315 U.S. at 460–61, 62 S.Ct. at 680–81. Rather than looking to possible subsequent activity, the common law doctrine focuses on " 'whether the agreement, *at the time it was entered into,* would tend to mislead the public authority.' " *Brookside Assocs. v. Rifkin,* 49 F.3d 490, 496 (9th Cir.1995) (quoting *Timberland Design, Inc. v. First Serv. Bank for Sav.,* 932 F.2d 46, 50 (1st Cir.1991)); *see also Federal Sav. & Loan Ins. Corp. v. Two Rivers Assocs.,* 880 F.2d 1267, 1275–76 (11th Cir.1989) (citing *Langley v. FDIC, supra,* 484 U.S. at 91–92, 108 S.Ct. at 401–02).

■ The fact that some of plaintiffs' claims sound in tort does not bar the application of *D'Oench, Duhme* estoppel. So long as the tort claims arise out of the secret agreement alleged, the common law doctrine applies. *See Timberland, supra,* 932 F.2d at 50; *see also Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 593–96 (11th Cir.1995) (en banc) (listing cases). Furthermore, the fact that plaintiffs assert the alleged agreement in support of their affirmative claim, rather than as a defense to an FDIC action, does not protect it from *D'Oench, Duhme* scrutiny. *See Timberland, supra,* 932 F.2d at 49–50; *Bowen v. FDIC,* 915 F.2d 1013, 1015 (5th Cir.1990); *Two Rivers, supra,* 880 F.2d at 1277.

■ Plaintiffs likewise err in arguing that the equitable character of the common law doctrine bars its application to the instant dispute. Plaintiffs misapprehend the equitable balance that *D'Oench, Duhme* strikes. The Supreme Court held that a borrower would be prevented from asserting a side agreement if the agreement "was designed to deceive the creditors or the public authority, *or would tend to have that effect." D'Oench, Duhme, supra,* 315 U.S. at 460, 62 S.Ct. at 680 (emphasis added). Merely lending oneself to a scheme or arrangement that is likely to mislead the FDIC suffices to trigger the equitable bar. Whether the signer of the note actually intended to deceive creditors or the FDIC is not dispositive. *Id.* at 459–60, 62 S.Ct. at 680–81.

In other words, the *D'Oench, Duhme* doctrine "favors the interests of depositors and creditors of a failed bank, who cannot protect themselves . . . over the interests of borrowers, who can." *In re Century Centre Partners Ltd.,* 969 F.2d 835, 839 (9th Cir.1992) (internal quotations and citations omitted). In the present case, plaintiffs failed to support their claim that the parties had agreed to a $1.3 million loan when they signed a loan document for $375,000 that included no reference to the larger amount. Because the breach they assert refers to an alleged side agreement that conflicts with the terms of the written loan agreement, plaintiffs' claims based on the side agreement can not be sustained. *Hall, supra,* 920 F.2d at 341.

Neither the minutes of the bank executive committee nor the unexecuted loan commitments establishes an enforceable agreement against the FDIC. *See Resolution Trust Corp. v. Carr,* 13 F.3d 425, 431 (1st Cir.1993) (board of director minutes) *and Federal Sav. & Loan Ins. Corp. v. Gemini Mgmt.,* 921 F.2d 241, 245 (9th Cir.1990) (unexecuted loan commitment letter). The Porter letter also fails to establish a claim against the FDIC. The conditional promises in the letter are not the type of explicit statements that survive

D'Oench, Duhme scrutiny. See Beighley v. FDIC, 868 F.2d 776, 783–84 (5th Cir.1989); Gemini Mgmt., supra, 921 F.2d at 245; Two Rivers, supra, 880 F.2d at 1275–76; Baumann v. Savers Fed. Sav. & Loan Ass'n, 934 F.2d 1506, 1515–16 (11th Cir.1991), cert. denied, 504 U.S. 908, 112 S.Ct. 1936, 118 L.Ed.2d 543 (1992). We do not reach plaintiffs' argument that the letter established a contract under New York law. Federal law applies here, and the letter fails to establish an obligation of the FDIC under D'Oench, Duhme. See Resolution Trust Corp. v. Daddona, 9 F.3d 312, 317–19 (3d Cir.1993).

Plaintiffs' last contention is that the Ninth Circuit's innocent investor exception to D'Oench, Duhme, as articulated in FDIC v. Meo, 505 F.2d 790 (9th Cir.1974), protects their claims. The defense of borrower innocence in D'Oench, Duhme cases was narrowly construed in Langley v. FDIC, supra. There, borrowers sought to avoid paying a note by alleging that the bank fraudulently induced them to sign the note. 484 U.S. at 88–89, 108 S.Ct. at 399–400. The Supreme Court rejected this defense in a broadly written opinion. Id. at 93–96, 108 S.Ct. at 402–03. To what extent the innocent investor exception survives Langley is a matter of some dispute. Compare In re 604 Columbus Ave. Realty Trust, 968 F.2d 1332, 1347–48 (1st Cir.1992); Dendinger v. First Nat'l Corp., 16 F.3d 99, 102 (5th Cir.1994) and Baumann, supra, 934 F.2d at 1516 (11th Cir.) with Murphy v. FDIC, 38 F.3d 1490, 1499–1500 (9th Cir.1994) (in banc) and Oklahoma Radio Assocs. v. FDIC, 987 F.2d 685, 691–95 (10th Cir.1993). In any event, the innocent investor exception clearly is not applicable here.

In Meo, supra, the Ninth Circuit extended the exception to borrowers who are innocent of any wrongdoing or negligence. 505 F.2d at 793. "A borrower who fails to ensure that the terms of the loan are explicitly incorporated into the obligation where the opportunity to do so exists is guilty of 'negligence.'" Century Centre Partners, supra, 969 F.2d at 839; see also Gemini Mgmt., supra, 921 F.2d at 245 (borrower's failure to ensure that alleged agreement for an additional loan is stated explicitly in loan documents consti-

tutes negligence). Plaintiffs' behavior would not fall within any such exception because they failed to ensure that the full amount of their alleged loan was stated in the loan documents.

In sum, we hold that pursuant to the principles enunciated by the Supreme Court in D'Oench, Duhme, plaintiffs' claims based on an alleged $1.3 million loan agreement are unenforceable against the FDIC, and the district court did not err in granting summary judgment in defendant's favor. The judgment therefore is affirmed.